**********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Baddour and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Baddour with minor modifications.
 **********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS 1. The date of the injury subject to this claim is February 6, 2007. *Page 2 
2. On such date, the parties hereto were subject to and bound by the provisions in the North Carolina Workers' Compensation Act.
3. On such date, an employer-employee relationship existed between Plaintiff and Employer-Defendant.
4. On such date, Employer-Defendant employed three (3) or more employees.
5. On such date, the carrier of workers' compensation insurance in North Carolina for Employer-Defendant was Gallagher Bassett Services, Inc.
6. Plaintiff's average weekly wage is $331.00, yielding a compensation rate of $220.67.
7. The following exhibits were admitted into evidence:
 (a) Stipulated Exhibit 1: Pre-Trial Agreement
 (b) Stipulated Exhibit 2: Plaintiff's Medical Records
 (c) Stipulated Exhibit 3: Industrial Commission Forms
 (d) Stipulated Exhibits 4A — 4P: Photographs
 (e) Plaintiff's Exhibit 1: Aerial Photograph of Worksite
 (f) Plaintiff's Exhibit 2: Payroll Statement
 (g) Offer of Proof: Employee Manual
 **********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the evidentiary hearing, plaintiff was 21 years old. He began his employment with defendant-employer at its Birkdale location in August 2004. He was promoted *Page 3 
to shift manager in approximately mid-2005 and was employed in that capacity through the date of his accident on February 6, 2007. Plaintiff was also a student at UNC-Charlotte. During the semester, he worked the night shift approximately 95% of the time. His accident on February 6, 2007 occurred during the semester.
2. As night shift manager, plaintiff generally worked from 4:30 p.m. to 11:30 or 11:45 p.m. His responsibilities included closing the store, handling the cash and computers, and cleaning up the store.
3. As part of his duties in cleaning up the store, plaintiff was required to take the trash to a designated dumpster. Emptying the trash benefitted defendant-employer. Although the company had a policy that the trash was not to be taken out after dark, plaintiff's supervisors also required that the trash had to be emptied if it did not fit inside the trash bin inside the store. The trash bin inside the store was a 65-gallon bin that generally contained old pastries, empty milk containers, coffee grinds and food. The trash would attract bugs if it did not fit into the container but instead was allowed to lay on the floor throughout the night. Plaintiff and Ryan Drye, also a shift manager, estimated that the trash had to be taken out at the end of the night shift approximately half the time. The shift managers were instructed to use their discretion and best judgment as to when and whether to take the trash out. As a course of defendant-employer's business, it was expected that the trash would be taken out when it did not fit inside the trash can.
4. Louis Jewitt was the manager and supervisor of both plaintiff and Mr. Drye. He testified that it would be unlikely that employees could empty the trash before it got dark on the shortest day of the year and not have to empty the trash again while it was dark. Plaintiff's accident occurred on February 6, 2007 at a time of the year when it gets dark early. *Page 4 
5. When leaving the store at the end of the shift, the employees proceeded out a side door onto a sidewalk that lead them directly to the area of the parking lot where all of the employees parked their cars. For safety reasons, the employees were all required to walk together at the close of the night shift to their cars. The employees were not allowed to park in front of the Starbucks because these spaces were saved for customers. Plaintiff always parked in the corner of the parking lot that was closest to the Starbucks location.
6. The trash had to be emptied into a specific dumpster that defendant-employer shared with Red Rocks, a restaurant in the same shopping center. When the employees were required to empty the trash, they had to take a left turn into an alleyway or walkway to the designated dumpster as opposed to proceeding down the walkway to the area in the parking lot where they parked their cars. This required the employees to take a route to their cars that they would not have otherwise taken. Neither plaintiff nor Mr. Drye had ever taken the route through the alleyway except when they were taking out the trash. They also were not aware of any employee who had ever taken the route through the alleyway except when they were required to take out the trash.
7. The designated dumpster was the only dumpster available to employees of defendant-employer and the only one ever used by plaintiff. In the alleyway used to get to the dumpster, there was a waste management can, three or four trash cans used by Red Rocks, a trash pit, and a grease pit also used by Red Rocks near the dumpster. The alleyway also served as a smoking area for some of the employees of Red Rocks. The area smelled badly.
8. In addition to not going through the alleyway because of the stench and trash, plaintiff and Mr. Drye both indicated it would be illogical to proceed to the parking lot through the alleyway because it is a different direction than where their cars were parked. *Page 5 
9. Immediately next to the dumpster is a set of stairs that connects to the parking lot. As opposed to walking back through the alleyway and the stench and trash in order to get to their cars, the employees walked down the four stairs to the parking lot and then proceeded to their cars.
10. On February 6, 2007, plaintiff had closed the store and was proceeding with Mr. Drye and another employee to empty the trash in the designated dumpster and then proceed to their vehicles. Plaintiff put the trash in the dumpster, pressed the button on the pole beside it in order to compact the trash, and attempted to turn to walk down the stairs located immediately next to the dumpster. As he was turning, his feet got tangled up on the ledge and he fell and sustained a significant injury to his right foot.
11. Plaintiff was carried to Mr. Drye's vehicle, who then drove plaintiff to Presbyterian Hospital-Huntersville.
12. The stairs on which plaintiff fell consisted of four steps. Plaintiff would not have had to negotiate these stairs while turning from the trash dumpster if he had taken the direct route from the store to his car.
13. Plaintiff presented to Presbyterian Hospital shortly after midnight on February 7, 2007 and was diagnosed with a right first metatarsal fracture, right second metatarsal fracture and right third metatarsal fracture. He was discharged.
14. Plaintiff and his parents called Dr. John Paul and arranged an appointment later on February 7, 2007. Dr. Paul's assessment was a right foot crush injury with displaced metatarsal fractures with foot early compartment syndrome. He ordered emergency surgery which was performed on February 7, 2007 consisting of a right foot open reduction internal fixation of the first and second metatarsals with fasciotomy. A second surgery was performed by *Page 6 
Dr. Paul on February 10, 2007 consisting of a right foot irrigation and debridement with closure of fasciotomy wounds. Plaintiff was released after five days in the hospital and then underwent extensive physical therapy. Plaintiff eventually had the pins removed.
15. Plaintiff was authorized by Dr. Paul to return to work on April 30, 2007. Plaintiff returned to work with defendant-employer on April 30, 2007.
16. Dr. Paul assigned a 20% permanent partial impairment of the right foot on June 28, 2007.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In general, a plaintiff is not compensated for injuries that occur while coming to and going from the workplace. However, there is an exception to that rule where "the conditions and obligations of the employment put the employee in the position or at the place where the accident occurs." Felton v. Hospital Guild of Thomasville,57 N.C. App. 33, 35,291 S.E.2d 158, 160 (1982). In the case at hand, plaintiff was performing a special errand for defendant-employer when he took a detour from his normal path to his car to take the trash to the dumpster, a task he was required to perform as part of his duties. The risk of performing the errand lasts from portal to portal, meaning the time from which plaintiff left defendant-employer's premises and arrived at his car in the parking lot. Powers v. Lady's Funeral Home. 306 N.C. 728,295 S.E.2d 473 (1982). Therefore, plaintiff sustained an injury by accident arising out of and in the course of his employment on February 6, 2007. N.C. Gen. Stat. § 97-2(6). *Page 7 
2. Plaintiff is entitled to temporary total disability compensation in the amount of $220.67 per week from February 7, 2007 to the date that he returned to work with defendant-employer on April 30, 2007. N.C. Gen Stat. § 97-29.
3. Plaintiff has been assigned a 20% permanent partial impairment to his foot by Dr. Paul. However, plaintiff has not had the opportunity to exercise his right to a second opinion with respect to the rating, and therefore this Opinion and Award does not address this issue. If in the future the parties are unable to reach an agreement regarding this issue, either party may request a hearing from the Commission.
4. Plaintiff is entitled to have defendants pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. § 97-2(19).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee approved below, defendants shall pay to plaintiff temporary total disability compensation at the rate of $220.67 per week for the time period beginning February 7, 2007 and continuing through April 29, 2007.
2. A reasonable attorney's fee in the amount of twenty-five percent (25%) of the compensation awarded to plaintiff in Paragraph 1 above is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel.
3. Defendants shall pay medical expenses incurred or to be incurred when bills for the same have been approved, in accordance with the provisions of the Act.
4. As plaintiff has not had the opportunity to exercise his right to a second opinion with respect to his permanent partial impairment rating, this Opinion and Award does not address this issue. However, if in the future the parties are unable to reach an agreement regarding this issue, either party may request a hearing from the Commission.
5. Defendants shall pay the costs due the Commission.
This the 2nd day of December 2008.
 S/_______________________
 DIANNE C. SELLERS
 COMMISSIONER
CONCURRING:
 S/_______________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________________ BUCK LATTIMORE COMMISSIONER *Page 1